PARKING MANAGEMENT, INC., Plaintiff,

v.

UNION CENTER PLAZA ASSOCIATES, INC., et al., Defendants.

Civ. A. No. 1148–73.

United States District Court, District of Columbia.

May 14, 1976.

Leonard C. Collins, Washington, D. C., for plaintiff.

William H. Horkan, Bernstein, Alper, Schoene & Friedman, Washington, D. C., for defendants.

## MEMORANDUM AND ORDER

SIRICA, District Judge.

On April 24, 1968, the plaintiff, Parking Management, Inc., (hereafter "PMI") entered into a written agreement with the defendants, Union Center Plaza Associates, et al., (hereafter "Plaza Associates") in which the Plaza Associates agreed to lease to PMI 252,000 square feet of garage space in the Union Center Plaza South Building, the construction of which had not yet begun. PMI presumably wished to lease the space for the purpose of operating a commercial parking facility in the lower levels of the building.

The written agreement provided for a period of twenty years with the specific rental charge per annum and six "conditions" concerning the operation of the agreement. The lease was to become effective upon 80% occupancy of the proposed office building structure. Condition No. 6 of this written agreement, the section of the agreement which is the subject of the dispute in this case, states as follows:

> 6. If 65% of the building proper is leased to a single tenant and this single tenant demands control of the parking facilities under their own specific parking operations then and only then will this lease be null and void.

Subsequent negotiations between Plaza Associates and the General Services Admin-istration (hereafter. "GSA"), based upon a solicitation package entitled "General Lease Specifications and Requirements No. 68" resulted in Plaza Associates submitting a lease proposal to the Government by which the Government would lease the entire net usable square feet of the office space of the Union Center Plaza South Building. The formal proposal was submitted to the Government on July 6, 1971, and amended July 8, 1971.

By letter dated September 3, 1971, the Government accepted the lease proposal submitted in response to General Lease Specifications and Requirements No. 68 and stated, among other things, that the unit rates for the parking must be established prior to a lease agreement; that a field measurement would be completed to determine whether the net usable square feet of space delivered would comply with the proposal; and that the award of the lease would be contingent upon Plaza Associates' compliance with certain additional clauses dealing with Executive Order 11615.[1]

As required by the Government, Plaza Associates indicated their concurrence with the letter of September 3, 1971 by signing a copy and returning it to the Government on September 7, 1971.

Subsequent to the signing of this letter agreement, further negotiations between Plaza Associates, GSA and representatives of the Federal Power Commission (hereafter "FPC"), the agency which was to occupy and become the actual tenant of the leased premises, took place. A formal "U. S. Government Lease for Real Property" was drawn in the spring of 1973 and signed by representatives of the Plaza Associates and the Government.

The lease was drawn on a "GSA Standard Form 2" and the parties backdated the "Date of Lease" to September 3, 1971, the date on which the Government notified Plaza Associates by letter of its acceptance, with certain conditions, of the lease proposal.

---

1. Executive Order No. 11615, signed by the President on August 15, 1971, provided for the stabilization of prices, rents, wages and salaries. 36 F.R. 15727.

Paragraph 1 of the lease described the premises as "253,547 net usable square feet of space in Union Center Plaza South Building located at 825 North Capitol Street, N. E., Washington, D. C." Paragraph 2 set the term of the lease as "twenty (20) years from the date of occupancy . . . . The exact date of the twenty year period will be established by Supplemental Agreement after acceptance of all of the space." And Paragraph 7 states in pertinent part:

7. The following are attached and made a part hereof:

\* \* \* \* \* \*

2. General Lease Specifications and Requirements No. 68, dated July 6, 1971.

3. The Lessor's offer dated July 6, 1971 as amended July 8, 1971.

4. The Government's letter of acceptance dated September 3, 1971 as concurred in by the Lessor on September 7, 1971.

The FPC began occupying the Union Center Plaza South Building in the spring of 1973. Soon thereafter the Federal Power Employees' Association began operating the parking garage for the use of the FPC employees. When PMI sought control of the parking facilities in accordance with their prior contract with Plaza Associates dated April 24, 1968, Plaza Associates refused to honor that contract. Plaza Associates took the position that the PMI contract was null and void due to the operation of "Condition 6" thereof, since the tenant demanded control over the parking facilities.

On June 12, 1973, PMI filed this suit for breach of contract seeking damages and specific performance.

## MOTION FOR SUMMARY JUDGMENT

This Court is of the opinion that there are no material facts in dispute in this case and that it is therefore ripe for summary judgment. The controversy which exists involves the interpretation of Condition 6 of the contract dated April 24, 1968 between PMI and Plaza Associates. This Court must determine whether, on the facts here present, this condition to the contract operated to render the contract null and void.

Under Condition 6 of the contract the parties agreed that the entire contract would be null and void upon the occurrence of the following three elements of Condition 6:

1. If 65% or more of the building were leased to a single tenant, and

2. If that single tenant demanded control of the parking facilities in that building, and

3. If the tenant demanded control under its own specific parking operations.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I.

The first element of Condition 6 is not in dispute since it is uncontroverted that the Government leased the entire net usable square footage of the building for the tenant FPC. Therefore more than 65% of the building was leased to a single tenant.

### II.

The occurrence of the second element of Condition 6 is more difficult to determine: whether the tenant made a "demand" for control of the parking facilities within the meaning of the contract. It seems clear that the intent of the parties in using this language in Condition 6 was to give the lessor, Plaza Associates, some flexibility in its negotiations with various prospective tenants in the securing of a long term lease for the office building portion of the structure. This is especially understandable in a case such as this, where the building had not yet even been started when the contract between PMI and Plaza Associates for the parking garage portion of the building was entered into. The lessor could not have possibly known the specific requirements, needs and desires of possible future tenants at that point in time. It is quite easy to see the lessor's purpose in making this condition a part of the agreement. Should a possible tenant or the tenant's representative, in negotiations for a lease, express the ten-

ant's desire for control over the parking facilities for the tenant's employees under its own parking arrangements, this matter could be negotiated and the lessor would be free to use such a request by a prospective tenant as a tool at the bargaining table. If such a "demand" by the tenant was made, then the lessor would be free to become a party to such a lease and the previous contract would be voided.

It appears to the Court that, from a fair reading of the contract, the term "demand" means "to require as a part of the lease agreement."

More simply stated, a "demand" within the meaning of the contract occurred if the tenant, or his representative, made the tenant's control of the parking facilities a requirement for signing of a lease agreement. The question, then, is whether such a "demand" was made here.

The instant case is complicated by the fact that, as in most government leases, the GSA primarily handled the negotiations leading up to the acceptance of the lease proposal for space to be occupied by the FPC, which would then become the tenant of the building.

In the early negotiations for the Government's possible leasing of the building, GSA prepared and forwarded to Plaza Associates a solicitation package entitled "General Lease Specifications and Requirements No. 68" (hereafter "Requirement 68"). This document of 53 pages was reviewed by the lessor and the lease proposal of July 6, 1971 was submitted by the lessor to the Government in response to this solicitation document. As shown above, this solicitation document was made part of the formal lease in paragraph 7 thereof.

Requirement 68 was a detailed enumeration of the particular terms under which the Government would accept a proposal for the lease they were seeking.

Page 51 of Requirement 68, which was initialled by representatives of Plaza Associates and the Government in the bottom right hand corner, set forth certain require-

ments concerning parking for employee vehicles in paragraph 9, subparagraph b:

b. In event offerors have parking available for employee use, even though not required by zoning regulations, offerors shall indicate in Paragraph 8 of the proposal to lease space the following additional information:

(1) Whether the parking spaces will be provided free of charge or what the maximum monthly charge per space will be during the lease term, and the number of parking spaces that will be made available. (In event parking spaces are to be furnished on a fee basis, the Government will not collect from employees nor be responsible for the payment of any parking charges).

(2) If the offeror will charge employees for use of the parking spaces, he should indicate whether he will lease the spaces as a unit to an employees' association, and if so, how much he will charge the association per month.

(3) The monthly charge per space, or the charge for the spaces as a unit, which shall prevail during the lease term in event the lessor agrees under the terms of the Government lease to provide parking spaces for employee use on a fee basis.

(General Lease Specifications and Requirements No. 68, dated July 6, 1971, at p. 51)

This part of Requirement 68 required the lessor to state, in the proposal to lease space, what parking space for employee use was available on the leased premises, including specific information concerning the number of parking spaces, rates, and the role of the employees association in the operation of the garage if the lessor intended to charge for use of the facilities.

As witnessed by the initialling of page 51 of Requirement 68 by representatives of both Plaza Associates and the Government, these terms concerning the availability of employee parking were assented to and conformed with by Plaza Associates when they submitted their lease proposal to the Government. And it is obvious that this

portion of Requirement 68 generated the negotiations which ultimately led to the Federal Power Employees Association's operation of the parking facilities.

Since the lease proposal was submitted by Plaza Associates to the Government in accordance with the terms of Requirement 68 on July 6, 1971, and the Government's letter of September 3, 1971, accepting the lease proposal was based upon the lessors' concurrence with the terms of Requirement 68 on September 3, 1971, and since Requirement 68 was made part of the formal lease drawn in the spring of 1973, the Court feels that a proper "demand" was made by the Government within the meaning of Condition 6 of the PMI contract.

In the affidavits submitted by PMI, the affiants state that no oral demand for FPC control of the parking facilities was made up to the time that the letter agreement of September 3, 1971 was signed. This fact is not disputed by the defendants. In this Court's view, however, despite the fact that an oral demand may not have been made, the terms of p. 51 of Requirement 68, paragraph 9(b) were a "demand" within the meaning of the PMI contract, and Plaza Associates acquiescence to those terms occurred prior to the letter of agreement. In addition, in negotiations subsequent to the letter agreement and prior to the execution of the lease agreement in the spring of 1973, the requirement that the FPC control the parking facilities was orally affirmed together with the reasons for this requirement as a condition to occupancy of the building. Affidavits submitted by the defendants, and not rebutted by the plaintiff, outline these negotiations. Mr. Webster Maxon, Executive Director of the FPC, states in his affidavit that:

4. In the negotiations leading up to the execution of the lease, the Federal Power Commission and the General Services Administration demanded control over the entire parking facilities in the Union Center Plaza South building under the specific parking operations of the Federal Power Employees' Association and General Services Administration . . . .

5. The demand for control of the parking facilities was made as a condition to occupancy of the building by the Federal Power Commission for several purposes. First, the Federal Power Commission considered this arrangement absolutely essential to the maintenance of security of the building. Second, the arrangement was essential to the success of the agency's staffing and employee recruitment efforts and to relations between the Commission and the Employees Association by making parking available for employees at a reasonable rate which is much less than the commercial rates prevailing in the area. (Affidavit of Webster P. Maxon, at pp. 1, 2.)

Affiant B. L. Metcalf, Project Engineer for Plaza Associates, also relates what occurred during these negotiations:

3. In the negotiations over the availability of parking spaces and other services in the building, the representatives of the General Services Administration and the Federal Power Commission absolutely demanded control over the entire parking facilities in the Union Center Plaza South Building under their parking operations.

*     *     *     *     *     *

5. In the heated negotiations regarding the availability of parking facilities to the Federal Power Commission employees, Government Services Administration and the Commission representatives stated that control of the entire parking facilities under this arrangement was necessary for the maintenance of security of the building and that the government did not want a third party exercising control over any of the parking facilities. The Federal Power Commission wanted control over the entire parking facilities for the further reason that the Federal Power Commission Employees Association demanded rates that were more reasonable than those that were available commercially and the association demanded control over the operation of the parking

facilities for the employees. (Affidavit of B. L. Metcalf at pp. 1, 2.)

These affidavits clearly point out the full weight and effect of the terms of paragraph 9(b), p. 51 of Requirement 68. This Court holds that a proper "demand" was made and that the second element of Condition 6 of the PMI contract was satisfied.

### III.

The occurrence of the third element of Condition 6, that the tenant must control the parking facilities under its own specific parking operations, is also contested by the plaintiff. PMI argues that since the garage is being operated by the employees association that the tenant, FPC, does not control the parking facilities "under their own specific parking operations" within the meaning of the contract.

The Court disagrees. From a fair reading of the contract it is plain that this term was inserted in Condition 6 to protect PMI's contract in a situation in which a tenant would demand control of the parking facilities, in order to void PMI's contract, and then re-lease or sub-let the garage to some other commercial parking concern. This is certainly not what was intended or what occurred here.

In this case, the tenant demanded control of the parking facilities for use by its employees. However, since the employees would be charged by the lessor for the parking, the tenant turned over the operation of the facilities to the employees association. This was all done in accordance with the terms of Requirement 68, p. 51, paragraph 9(b). The employees association could in no way be viewed as an independent commercial enterprise. The association agreed to operate the facilities on basically a non-profit arrangement[2] for FPC employees, providing such services as assignment of parking spaces, collection of fees and bookkeeping.

It is the opinion of this Court that this arrangement falls within the meaning of "under . . . [the tenant's] own specific parking operations" in Condition 6 of the PMI contract. Therefore, this third element of Condition 6 has also been met.

Since this Court finds that all three elements of Condition 6 were properly satisfied by the facts of this case, the contract of April 24, 1968 between Plaza Associates and PMI was rendered null and void by the operation of Condition 6 thereof, and it is this 14th day of May, 1976,

ORDERED that defendants' motion for summary judgment be, and the same hereby is, granted; and it is

FURTHER ORDERED that judgment be entered for the defendants.

---

2. Under the operation of the garage each employee would pay $26 per month for each space and the association would then remit $25 per space per month to the lessor. (Letter from Mr. Sheldon Bernstein of Plaza Associates to Mr. Brian Smith, President of the Federal Power Employees Association, dated May 16, 1973.)